UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| JULIEANNE DAHL individually and as | ) | |
| Independent Executor of the estate of | ) | |
| Russell Dahl, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | CAUSE NO. 3:14-cv-1734-MGG |
| | ) | |
| v. | ) | |
| | ) | |
| BRIAN HOFHERR, *et al.*, | ) | |
| | ) | |
| Defendants. | | |

**OPINION AND ORDER**

On June 15, 2016, Defendants, Brian Hofherr and AG Trucking, Inc. filed their Motion to Exclude Expert Witness Testimony. Plaintiff, Julianne Dahl, filed her response in opposition to Defendants' motion on July 8, 2016. Defendants' motion became ripe on July 18, 2016, when they filed a reply brief. Jurisdiction in this Court is proper under 28 U.S.C. § 1332(a)(1), as Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.000, exclusive of interest and costs. The Court issues the following opinion pursuant to the consent of the parties and 28 U.S.C. § 636(c).

I.     **RELEVANT BACKGROUND**

On December 11, 2013, Russell Dahl died as the result of injuries sustained in a car collision on U.S. Highway 30 near County Road 600 East, Washington, Indiana leaving behind his wife, Julianne Dahl, and his three adult children. The collision resulted when the tractor-trailer, driven by Defendant Hofherr, lost traction and yawed sideways before crossing the median and striking Mr. Dahl's automobile.

At the time of the collision, wintry precipitation or its effects were present in the area despite the parties' dispute as to the actual road conditions resulting from the weather. The speed limit in the area of the collision was 60 miles per hour. Defendant Hofherr was driving west at 59 miles per hour and Mr. Dahl was driving east at 63 miles per hour while alongside a marked Sheriff's Police vehicle driven by Sheriff Oscar Cowan in the left lane. Hofherr submitted to a mandatory blood test, which yielded positive results for the presence of active tetrahydrocannabinol ("THC"), a cannabinoid.

As a result of the collision, two legal matters are pending—one against Defendant Hofherr related to criminal felony charges of "Operating a Vehicle While Intoxicated Resulting in Death," under Ind. Code § 9-30-5-5(b)(2) and the instant civil action by Mrs. Dahl against Defendants for torts under Indiana's Wrongful Death Act. After completing fact discovery in the instant action, Mrs. Dahl disclosed the identity of three expert witnesses in compliance with Fed. R. Civ. P. 26(a)(2). Specifically, Mrs. Dahl disclosed (1) Dwayne G. Owen, an accident reconstructionist with related expertise in commercial motor vehicle operations and safety, and (2) David S. Gibson, a vocational economist expected to testify as to the value of Mr. Dahl's lost future earnings, both of which submitted expert reports pursuant to Fed. R. Civ. P. 26(a)(2)(B). Pursuant to Fed. R. Civ. P. 26(a)(2)(C), Mrs. Dahl also disclosed Dr. Sheila A. Arnold, the Forensic Toxicologist and Quality Control Coordinator for the Indiana Department of Toxicology, who did not submit a written report, but is expected to testify that Defendant Hofherr's alleged impairment from THC was the proximate cause of the collision.

Through the instant motion, Defendants now challenge the reliability of these three experts asking the Court to exclude any testimony from them at trial. Defendants argue that the

expert opinions are either unsupported by the evidence or that the expert is not qualified to give

such an opinion.   In general, Mrs. Dahl argues that all of the experts should be allowed to testify

because the evidence supports their conclusions and each is qualified to give their opinion.   The

propriety of each expert's testimony will be considered in turn below.

## II.   ANALYSIS

### A.   Applicable Legal Standard

Federal Rule of Evidence 702 governs the admission of expert testimony and states that

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if:

(a)      the expert's scientific, technical, or other specialized knowledge will help
the trier of fact to understand the evidence or to determine a fact in issue;
(b)      the testimony is based on sufficient facts or data;
(c)      the testimony is the product of reliable principles and methods; and
(d)      the expert has reliably applied the principles and methods to the facts of
the case.

As a threshold matter, courts must examine whether 1) the expert will "testify based on *valid*

scientific, technical, or specialized knowledge, *i.e.*, whether the expert's testimony is reliable,"

and 2) whether that testimony will assist the trier of fact in understanding or determining a fact in

issue.  *Ruppel v. Kucanin*, No. 3:08 CV 591, 2011 WL 2470621, at *2 (N.D. Ind. June 20, 2011)

(citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)); *see also Smith v. Ford

Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Accordingly, courts play a critical "gatekeeper" role ensuring that any expert testimony or

evidence admitted is not only relevant but reliable.  *Mihailovich v. Laatsch*, 359 F.3d 892, 918

(7th Cir. 2004).   To fulfill the gatekeeper role, courts must determine whether an expert is

qualified in the relevant field and whether the methodology underlying the expert's conclusion is

reliable.  *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004).  Experts

can be qualified to testify based upon personal experience and knowledge, so long as the

experience and knowledge is reliable.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150

(1999); *Smith*, 215 F.3d at 718.  A court should examine the full range of practical experience

and technical training, as well as examine the methodology used in reaching a conclusion when

deciding whether an expert is reliable and qualified to testify.  *Smith*, 215 F.3d at 718.

Nevertheless, the judge retains "the discretionary authority . . . to determine reliability in

light of the facts and circumstances in a particular case."  *Kumho Tire Co.*, 526 U.S. at 158.  An

expert's testimony is admissible when it provides "something more than what is obvious to the

layperson in order to be of any particular assistance to the jury."  *Dhillion v. Crown Controls

Corp.*, 269 F.3d 865, 871 (7th Cir. 2001).  In addition, "[a]n expert must substantiate his

opinion; providing only an ultimate conclusion with no analysis is meaningless."  *Winters v.

Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007) (internal quotations omitted).  Similarly,

opinion evidence may be unreliable and worthy of exclusion if a court concludes "that there is

simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co.

v. Joiner*, 522 U.S. 136, 146 (1997).  Stated another way, an expert opinion that only consists of

"subjective belief or unsupported speculation" should be excluded.  *Deimer v. Cincinnati

Sub-Zero Prod., Inc.*, 58 F.3d 341, 344 (7th Cir. 1995) (quoting *Daubert*, 509 U.S. at 590).

However, exclusion of expert testimony should be the exception, not the rule. *See

Advisory Committee Notes to Rule 702*.  The jury must still be allowed to play its essential role

as the arbiter of the weight and credibility of testimony.  *Stollings v. Ryobi Techs., Inc.*, 725 F.3d

753, 765 (7th Cir. 2013).  The soundness of the factual underpinnings of the expert's analysis

and the correctness of the expert's conclusions based on that analysis remain factual matters to be determined by the jury. *Id.*; *see also Lees v. Carthage Coll.*, 714 F.3d 516, 525 (7th Cir. 2013)

### B.    Dwayne G. Owen, Accident Reconstructionist

As demonstrated on his curriculum vitae and deposition testimony, Mr. Owen—retained as an expert by Mrs. Dahl—is a Certified Accident Reconstructionist, Certified Crash Data Retrieval System Operator, and a Certified Forensic Examiner who has investigated over 6,000 motor vehicle accident throughout the United States.   Upon retiring from his position as Deputy Chief of the City of Freeport Police Department after 20 years of service that included regular and routine performance of accident reconstruction, Owen joined Ruhl Forensic, Inc., where he worked for another 20 years as a consultant and expert in accident reconstruction, commercial motor vehicle operation and traffic safety.   Owen now owns and operates Crash Response, LLC, holds a Class A Commercial Driver's License with endorsements.

As requested by Mrs. Dahl, Owen prepared an Expert Report in which he opined about the collision between the vehicles driven by Defendant Hofherr and Mr. Dahl.   Owen opined that (1) Hofherr was driving too fast for roadway conditions and failed to keep a proper lookout; (2) Hofherr employed improper techniques to regain control of his tractor-trailer; (3) Hofherr was operating his tractor-trailer while under the influence of THC, a controlled substance, in violation of federal and state law; and (4) Mr. Dahl operated his vehicle with reasonable care and had no opportunity to avoid the crash.[1]   In the Report, Owen indicated that he had based these opinions on his

> knowledge, education, training and experience, [his] familiarity with the relevant commercial motor vehicle operation and safety standards and [his] review of

---

[1] Mr. Owen submitted a supplemental expert report with opinions rebutting those of Defendants' experts.   Doc. No. 69-1 at 48.

- Auto CAD drawing by Crash Response, LLC, a computer aided design/drafting application from Autodesk, Inc., Sausalito, CA
- Bosch CDR Crash Data Retrieval, Powertrain EDR Data, downloaded by Brach Engineering on 02/14/2014
- Case Report, Starke County Sheriff's Department, dated 12/11/2013
- Caterpillar Electronic Technician ECM Data, downloaded on 12/23/2013
- Computer Aided Dispatch Detail, Indiana State Police, 12/11/2013
- Deposition of Boehlke, Amanda; dated 06/16/2015
- Deposition of Cowan, Oscar; dated 11/23/2015
- Deposition of Hofherr, Brian; dated 06/16/2015
- Deposition of Sherer, Nathan; dated 05/13/2015
- DOT Drug Test Results / Indiana State Dept of Toxicology Records
- US Health Works Drug Test Results
- Driver Logs, Driver Brian Hotberr, Carrier Ag Trucking, Inc.
- Employment Information Handbook, Ag Trucking, lnc.
- Federal Motor Carrier Safety Regulations, 382.213 Controlled substance use, U.S. Department of Transportation, Federal Highway Administration.
- Indiana Code §9-30-5-l(c)
- Indiana Code §9-30-5-5(b)(2)
- Hamlet Fire Department Run Sheet, dated 12/11/2013
- Impound - Towing Records, Howard & Son's Towing & Salvage, Hamlet, IN, dated 12/11/2013 & 12/13/2013
- Indiana Commercial Driver's License Test Booklet, www.in.gov.
- Indiana Driver / Vehicle Examination Report, filed by the Indiana State Police, dated 12/11/2013
- Indiana Officer's Standard Crash Report, filed by the Starke County Sheriff's Office, dated 12/11/2013.
- Legal Documents, Various Defendants & Plaintiff materials
- Criminal Complaint in State of lndiana v. Hotherr, No. 75COl-1507-FB
- Maintenance / Service Records, Ag Trucking, Inc.
- Meritor WABCO Maintenance Manual, Anti-Lock Braking System ECUs
- Meritor WABCO PLC Trailer ABS, Valve Assemblies & Sensor Location
- Meritor WABCO Technical Bulletin, PLC Display
- Meritor WABCO Toolbox Software User's Manual
- Motor Vehicle Accidents, Report by Ag Trucking, Inc., dated 12/11/2013
- Motor Vehicle Driving Record Information Reports, State of Indiana, Driver Brian Hofherr
- Order Entry, Report by Ag Trucking, Inc., dated 12/10/2013 for 12/11/2013 arrival
- Photographs, 36 color laser prints of the crash scene supplied in the Defendant's discovery responses
- Photographs, 8 color laser prints of the crash site supplied in the Defendant's discovery responses

• Photographs, 58 color laser prints of the vehicles supplied in the Defendant's discovery responses
• Photographs, 3 color digital images of the crash site from Google Earth Pro, by Crash Response LLC
• Photographs, 36 color digital images of the crash site by the Starke County Sheriff's Department
• Time Zone Data for Indiana Counties

Doc. No. 69-1 at 24–25.

Defendants challenge the reliability of Owen's expert opinions regarding the collision of Hofherr's tractor-trailer and Mr. Dahl's automobile. Defendants make no argument as to the validity of Owen's scientific knowledge, but do argue that Owen's expertise could not be helpful to a jury because his conclusions about the how the collision occurred are based solely on lay testimony without any consideration of the physical evidence. *See Dhillion*, 269 F.3d at 871. Accordingly, Defendants allege that the methodology used by Owen in reaching his conclusions are not reliable and should be excluded.

In addition, Defendants contend that Owen's opinions that Hofherr was driving too fast for the conditions, failed to maintain a proper lookout, and employed improper driving techniques constitute mere speculation unsupported by evidence. *See Deimer*, 58 F.3d at 344. Defendants further argue that Owen is not qualified to offer opinions as to Hofherr's alleged impairment due to the THC in his system. And lastly, Defendants contend Owen did not reconstruct the accident so as to confirm his conclusion that Mr. Dahl operated his vehicle with reasonable care and had no opportunity to avoid the collision.

In support, Defendants cite to evidence in the record with particular reliance upon Owen's own deposition testimony in which he stated that he had only conducted a partial, not a full, reconstruction of the collision; that he did not inspect the accident site, Hofherr's tractor-trailer,

or Mr. Dahl's automobile; that he conducted no analysis or speed calculations as to either vehicle; that he did not analyze the positions of either vehicle before, during, or after the collision; that he did not speak with any witnesses or the investigating police officer; and that he made no independent determination of the weather or road surface conditions at the time of the collision. Defendants acknowledge that Owen created an AutoCAD drawing showing the distance from the resting positions of the vehicles after impact to the area of the roadway where Hofherr testified that his vehicle started sliding. However, Defendants question Owen's ultimate conclusions citing deposition testimony to suggest that he drew no conclusions from the AutoCAD drawing or the measurements shown on it.

Not surprisingly, Mrs. Dahl disagrees with Defendants' assessment of the reliability of Owen's opinions. Mrs. Dahl argues that Owen's experience as a law enforcement officer engaged in accident reconstruction and traffic safety and his subsequent career as an accident reconstructionist and commercial motor vehicle operations consultant combined with the physical evidence and testimony in the factual record support and provide the necessary foundation for Owen's opinions. Moreover, Mrs. Dahl contends that Defendants' arguments to exclude Owen's testimony relate to the weight of the opinion evidence rather than the admissibility of the evidence in the record. *See Stollings*, 725 F.3d at 765; *see also Lees*, 714 F.3d at 525. As seen below, Mrs. Dahl is convincing, but only to a certain degree.

### 1. Driving Too Fast for Conditions and Failure to Maintain Proper Lookout

In attacking Owen's conclusions about Hofherr's driving, Defendants contend that Owen's factual bases regarding the weather and roadway conditions are speculative and

contradicted by evidence in the record.    Relying upon Hoffherr's and Sheriff Cowan's deposition testimony and ECM data from Hofherr's vehicle, Defendants conclude that Hofherr was not driving too fast for the conditions and argue that Owen's opinion to the contrary was not consistent with the objective evidence.    Defendants also contend that Owen's failure to perform calculations to determine the speed at which Hofherr could have avoided the collision demonstrates that Owen's opinion is merely unsupported speculation.

The Court is not persuaded.    Defendants have criticized Owen's conclusions about road conditions and Hofherr's speed based on their own interpretation of the witness testimony, photographs from the scene, PCM data from Mr. Dahl's vehicle, and ECM data from Hofherr's vehicle.    Defendants' suggestion that Owen relied on no physical evidence to reach his conclusion is also misplaced.    Indeed, Owen's Report notes the long list of evidence he reviewed in reaching his opinion, including but in no way limited to the very photographs, PCM data, and ECM data referenced by Defendants.    Close reading of Owen's Report also shows that he took into account Hofherr's legal obligations as a commercial motor vehicle ("CMV") driver, citing Federal Motor Carrier Safety Administration regulation § 392.14, which dictates drivers' obligations to exercise extreme caution in hazardous conditions, and Hofherr's record as a CMV driver, which led Defendant Ag Trucking to put him on probation for a previous collision involving excessive speed for the roadway conditions.    Doc. No. 69-1 at 28.    Defendants clearly disagree with Owen's interpretation of that evidence, but they have not established that Owen's opinions were speculative or unsupported.    Instead, Defendants' arguments merely attack the weight of Owen's conclusions.

Defendants also attack the legal foundation of Owen's conclusions that Hofherr was driving too fast and failed to maintain a proper lookout for poor conditions. Defendants contend that Owen's opinion is directly contrary to Indiana law citing *Echterling v. Jack Gray Transport, Inc.*, 267 N.E.2d 198 (Ind. App. 1971). The Court agrees with Defendants that *Echterling* stands for the proposition that "the sudden skidding of an automobile, in and of itself and unattended by prior negligence from which such skidding proximately results, does not constitute negligence." *Id.* at 203. Indeed, if Owen had simply relied upon Hofherr's loss of control to speculate that Hofherr was driving too fast and did not properly watch for poor road conditions, *Echterling* might give the Court pause. However, Owen's conclusions were based on much more than Hofherr's loss of control, as shown above. As a result, Defendants' reliance on *Echterling* is inapposite.

Therefore, Owen's opinions about Hofherr's speed and attention to the road are based on a reliable methodology. Any disagreements Defendants have with his methodology or the conclusions resulting therefrom can be raised before the jury, which can then fulfill its obligation to assess the proper weight to be given to all evidence, including expert opinions like Owen's.

### 2. Employed Improper Techniques

Similarly unpersuasive is Defendants' argument that Owen's opinion, as to Hofherr's driving techniques used when he attempted to maneuver after his vehicle lost traction, is unreliable. In his Report, Owen opined that Hofherr employed improper driving techniques to regain control of the tractor-trailer and that these improper techniques contributed to his total loss of control of the vehicle. Doc. No. 69-1 at 29. In reaching that conclusion, Owen relied upon Hofherr's deposition testimony and ECM data from his vehicle showing that he (1) steered left

10

once the vehicle started to jackknife rather than counter-steering to the right to regain control; (2) failed to apply the brakes during the last eight seconds of the ECM data; and (3) pressed the accelerator 100% during the first two of those eight seconds.   Defendant argues that other evidence in the record, including Sheriff Cowan's deposition testimony, police photos, and the PCM data from Mr. Dahl's vehicle, leads to conclusions contrary to those reached by Owen.

Once again, Defendants ask the Court to exclude Owen's opinion because evidence in the record allegedly contradicts Owen's conclusion.   Defendants, however, overlook the fact that Owen relied on evidence in the record to reach his conclusions.   Just because Defendants' interpretation of evidence in the record leads to a different conclusion does not make Owen's opinion unreliable.   Instead, Defendants have only demonstrated that Owen's opinion must be tested by a jury charged with ascertaining the weight and credibility of expert testimony.   Said another way, Defendants highlight disputes as to the factual underpinnings of Owen's analysis and the correctness of Owen's conclusions based on his analysis.   Resolution of such disputes fall clearly in the fact finder's purview, which should not be derailed by exclusion of Owen's testimony at trial.   *See Stollings*, 725 F.3d at 765.

### 3.     Defendant Hofherr's Alleged Impairment

Defendants also challenge the reliability of Owen's qualifications to testify that Hofherr was under the influence of THC at the time of the collision with Mr. Dahl and that THC impairment was the proximate cause of the collision.   Defendants contend that Owen lacks the qualifications to reach such conclusions because he is neither a toxicologist nor a human factors expert.   In support, Defendants rely on *Cunningham v. Masterwear, Inc.*, No. 1:04-cv-1616-JDT-WTL, 2007 WL 1164832 (S.D. Ind. Apr. 19, 2007).   In *Cunningham*, an

environmental contamination tort case, two doctors intended to testify that the plaintiffs'
exposure to hazardous chemicals caused their illnesses. *Id.* at *3, *9. However, the court
found that neither doctor was qualified to testify as to causation because neither was trained in
the relevant fields of toxicology and epidemiology. *Id.* at *10.

Here, Owen admits that he is not a toxicologist but argues that other training and
experience qualifies him to opine about the effects of THC on a CMV driver like Hofherr. For
instance, Owen testified at his deposition that he was required to enforce toxicology laws while
working in law enforcement. Doc. No. 69-1 at 149. Similarly, Owen testified that
reconstructing accidents has required him to assess drivers, vehicles, roadway conditions, and the
surrounding environments. *Id.* As a result, he stated that is generally familiar with the threat
intoxicated drivers pose to society and other drivers; the decreased ability of intoxicated drivers
to understand how fast they are traveling in their vehicles due to decreased awareness of their
surroundings; and the decreased ability of intoxicated drivers to perceive things around
themselves, their vehicle, the roadway, and the environment. *Id.* Based on this testimony, Mrs.
Dahl concludes that Owen is qualified to opine as to whether Hofherr violated relevant standards
related to impaired driving and whether he violated relevant state and federal regulations
governing impaired operation of CMVs. However, Mrs. Dahl's argument is brief and not
completely persuasive.

Owen's experience in law enforcement and accident reconstruction definitely qualifies
him to testify as to the effects generally of drugs, and possibly THC, on drivers. After all, it is
clear Owen has observed multiple scenarios where drivers were intoxicated and impaired. Yet
Mrs. Dahl has not effectively demonstrated Owen's qualifications to opine on whether Hofherr's

specific conduct violated any laws.   Owen's experience likely exposed him to fact patterns that resulted in convictions, but Owen does not report any evaluation of Hofherr's specific conduct. Instead, Owen seems to be using generalizations about the effects of THC to support his opinions about Hofherr's conduct specifically.   Without a reliable methodology to support the conclusions, Owen's opinion on Hofherr's alleged THC impairment creates an unacceptable analytical gap between the data Owen reviewed and the opinion he proffered, especially on the critical issue of proximate causation.   *See Gen. Elec. Co. v. Joiner*, 522 U.S. at 146.

For instance, Owen's opinion, based on his legitimate and relevant experience in law enforcement and accident reconstruction, lacks scientific or other evidence to connect Hofherr's test results showing THC in his system to his absolute, unqualified conclusion that "Defendant Hofherr's use of THC, driving at an unsafe speeding given roadway conditions, failing to keep a proper lookout and improper crash avoidance maneuvers directly and proximately caused the crash."   Doc. No. 69-1 at 30.   Owen's brief analysis in his expert report on the effects of Hofherr's THC level demonstrate the analytical gap.

Owen begins his analysis by citing to the undisputed fact that THC was shown to be present in Hofherr's system through blood and urine tests.   From that fact, Owen concludes, without further explanation, that "[a]t the time of the occurrence, [Hofherr] was in violation of several federal and state laws that are intended to protect persons like Mr. Dahl from the risk of harm of the nature and type caused by Defendant Hofherr."   *Id*. at 29.   He then quotes the relevant laws, specifically FMCSA § 382.213, the federal regulation governing controlled substance use among CMV drivers; Indiana Code § 9-30-5-1(c), making operation of a vehicle with THC in the driver's body a misdemeanor; and Indiana Code § 9-30-5-5(b)(2), making

causing another's death while operating a vehicle with THC in the driver's blood a felony before reporting the pending status of Hofherr's criminal proceeding.   *Id*. at 30.

Owen then proceeds to opine in a single paragraph that:

Operating a CMV is a demanding task that requires fitness and alertness.   The driver must be able to give adequate attention to the environment, the operation of the CMV, identify potential hazards and make good judgments.   Operating under the influence of drugs such as THC impairs a driver's reaction time, ability to think clearly and to properly control a CMV.   Defendant Hofherr's use of THC, driving at an unsafe speeding [sic] given roadway conditions, failing to keep a proper lookout and improper crash avoidance maneuvers directly and proximately caused the crash.

*Id*.   While Owen's experience may indeed qualify him to conclude generally that "[o]perating under the influence of drugs such as THC impairs a driver's reaction time, ability to think clearly and to properly control a CMV," nothing connects this "expert" knowledge to conclude that Hofherr was impaired by the THC and the impairment proximately caused the collision with Mr. Dahl's vehicle.

In addition, the relevant expert conclusion that Owen offers—that drugs impair a driver's control of a vehicle—requires no specialized knowledge to reach.   The effects of drugs, including cannabinoids, is common knowledge to any juror who ever watched television, attended school, or otherwise interacted with modern American society.   "Jurors do not leave their knowledge of the world behind when they enter a courtroom and they do not need to have the obvious spelled out in painstaking detail."   *Dawson v. Delaware*, 503 U.S. 159, 171 (1992); *see also Sommerfield v. City of Chicago*, 254 F.R.D. 317, 329 (N.D. Ill. 2008) (citing *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004)) (excluding an expert's testimony that was at a level of generality "clearly within the average person's grasp.").

In short, Owen's opinion on the effects of THC, especially whether it was the proximate cause of Hofherr's collision with Mr. Dahl, will not aid the jury in determining the facts in this case and are unreliable given Owen's lack of qualifications in toxicology and human factors as well as the analytical gap in his analysis. Therefore, his testimony on the effects of the THC in Hofherr's system must be excluded.

### 4.    Actions of Mr. Dahl

In his expert report, Owen opined that "Russell B. Dahl operated his vehicle with reasonable care and had no opportunity to avoid the crash." Doc. No. 69-1 at 30. However, Owen's subsequent analysis of Mr. Dahl's actions and reactions while driving in the time surrounding the collision with Hofherr's tractor-trailer presents an analytical gap between the evidence he cites and the conclusion he reaches.

Owen starts his analysis by indicating that his opinion was based on PCM data from Mr. Dahl's vehicle and the deposition testimony of Sheriff Oscar Cowan,

> "who stated that (1) he was driving 'side by side' with Mr. Dahl, who was on his right side in the right lane of eastbound US 30; (2) that he and Mr. Dahl were traveling approximately the same speed within the speed limit; (3) and that Mr. Dahl did not at any time operate his vehicle in a way that Sheriff Cowan considered to be unsafe."

*Id.* at 30–31. Owen then cited PCM data showing that Mr. Dahl "appl[ied] the brakes for approximately 3 seconds and reduce[d] his speed [from 63 miles per hour] to somewhere in the range of 30-33 miles per hour immediately prior to impact." *Id.* at 31. Owen then references Sheriff Cowan's affirmative testimony "that Mr. Dahl was at all times operating his vehicle with the reasonable degree of care that would be expected of someone and that there was nothing Mr. Dahl could have done to avoid the accident." *Id.* Owen concludes with Sheriff Cowan's

testimony that he was lucky not to have been struck by Hofherr's tractor-trailer given his proximity to the collision with Mr. Dahl.   *Id.*

Clearly missing from Owen's analysis is any indication of what value he added to Sheriff Cowan's testimony and the raw PCM data about Mr. Dahl's speed and braking before impact. While it is possible that Owen relied upon his training and experience in law enforcement and accident reconstruction to reach his conclusion about Mr. Dahl's actions, he has not shown that even used his expert qualifications at all.   Instead, he appears to have simply regurgitated the eyewitness testimony of Sheriff Cowan that was based on Cowan's own expertise as a law enforcement professional.   Owen did not perform a complete reconstruction of the accident.   He did not use the PCM data to perform calculations about Mr. Dahl's speed, his ability to swerve, or even the effect had Mr. Dahl continued at the same rate of speed rather than slowing down or even speeded up.   As a result, Owen's methodology is flawed and his testimony would not assist the jury in evaluating the PCM data or Sheriff Cowan's testimony about Mr. Dahl's actions related to the collision.   Accordingly, his opinions on Mr. Dahl's conduct are unreliable and should be excluded.

**B.      David S. Gibson, Vocational Economist**

Mrs. Dahl retained vocational economist David S. Gibson to assess Mr. Dahl's lost earnings as a result of his death.   On January 12, 2016, Gibson presented his expert report to Mrs. Dahl's counsel concluding that "[t]he loss of earning capacity sustained by Russell Dahl is in a range of $1,772,702 to $1,905,467 stated in terms of present value."   Doc. No. 69-1 at 53. Without questioning Gibson's qualifications as a vocational economist, Defendants challenge Gibson's conclusion alleging that he relied on a flawed methodology in calculating Mr. Dahl's

lost earnings.   Specifically, Defendants contend that because Gibson's calculation did not discount Mr. Dahl's earnings by his anticipated personal consumption as required by Indiana law. As such, Defendants ask the Court to exclude Gibson's testimony as unreliable.

In support, Defendants rely on *Elmer Buchta Trucking, Inc. v. Stanley*, 744 N.E.2d 939, 942–43 (Ind. 2001).   In *Elmer Buchta Trucking*, the Court considered the appropriate measures of damages in actions brought under Indiana's wrongful death statute.   The Court explained that

> in applying the wrongful death statute to compensate the deceased's beneficiaries for losses they suffer, the defendant should be permitted to present evidence of the deceased's personal consumption. If juries cannot deduct the deceased's personal living expenses from lost earnings, the amount of the award will necessarily exceed the actual financial loss experienced by the beneficiaries. This result is not one contemplated by the statute.

*Id.* at 943.   Based on this analysis, the court then held that "the proper measure of damages must include a deduction based on the costs of this personal maintenance."   *Id*.

Defendants want the Court to exclude Gibson's calculation because it does not consider Mr. Dahl's personal consumption at all.   However, Defendants expectations of Gibson are too high.   They cite nothing in Indiana law that requires a particular expert's testimony to include calculations of the decedent's personal consumption.   *Elmer Buchta Trucking* simply requires that juries consider and include a deduction in lost earnings damages based on the costs of personal maintenance, but makes no indication of how or by whom that evidence should be presented to the jury.   *Id.*   As such, *Elmer Buchta Trucking* does not make Gibson's opinions unreliable or irrelevant.   While Gibson's opinions may not provide complete information for determining damages under Indiana law, that information can be presented to the jury through other evidence or jury instructions.

**C.      Dr. Sheila A. Arnold, Toxicologist**

In her Rule 26(a)(2) Witness Disclosures dated January 14, 2016, Mrs. Dahl identified Dr. Sheila Arnold, Ph.D. as an expert witness not providing a written report pursuant to Rule 26(a)(2)(C).   Mrs. Dahl disclosed that Dr. Arnold was expected to testify as to (1) Hofherr's intoxication and impairment at the time of the collision with Mr. Dahl; (2) the procedures and protocols used by the Indiana State Department of Toxicology ("ISDOT"), Dr. Arnold's employer, in performing drug tests and preparing toxicology reports, including Hofherr's; (3) the interpretation of Hofherr's drug test results in light of Indiana statutes; (4) foundational information related to ISDOT's information related to this case; and (5) her deposition testimony. Doc. No. 69-1 at 20–21.   At her deposition, Dr. Arnold testified as to many relevant and unchallenged matters.   However, Dr. Arnold specifically testified that she believed "that the THC in [Hofherr's] blood resulted in an impairment which contributed to the accident."   *Id.* at 230, 36:17–20.   Defendants argue only that Dr. Arnold is not qualified to opine regarding accident causation and that her opinion is therefore inadmissible under Fed. R. Evid. 702.

Defendants takes no issue with Dr. Arnold's doctoral degree in toxicology and pharmacology or her position as the Forensic Toxicologist and Quality Control Coordinator for ISDOT.   Defendants appear to accept that these credentials, combined with Dr. Arnold's direct experience handling the testing of Hofherr's blood and urine samples, qualify her to opine about the effect of drugs and other chemicals on the body generally as well as on Hofherr's body specifically.   However, Defendants ask the Court to reject Dr. Arnold's opinion regarding causation as unreliable because she is not an accident reconstructionist and she lacks experience in reconstructing accidents.

18

Mrs. Dahl does not claim that Dr. Arnold qualifies as an accident reconstructionist. However, Defendants cite no authority for the proposition that a toxicologist and pharmacologist cannot opine as to causation or that only an accident reconstructionist can testify as to causation. While not as directly applicable as Defendants suggest, *Wintz v. Northrop Corp.*, 110 F.3d 508 (7th Cir. 1997) in instructive as to the Court's *Daubert* analysis.

In *Wintz*, the court ultimately held that the expert toxicologist was unqualified to testify as to the specific causation of birth defects that were allegedly caused by the mother's exposure to a chemical at her workplace while pregnant. *Id.* at 513–14. The court did not reach this conclusion simply because of the expert's credentials as only a toxicologist. Instead, the court conducted a thorough analysis of the toxicologist's methodology in reaching the causation opinion, especially the expert's consideration of evidence specific to the mother's situation as compared to the expert's general knowledge of the effect of chemicals on humans. *Id.* After this analysis, the court held that the toxicologist "did not possess sufficient expertise or knowledge as to the relevant medical question dealing with the proximate cause of [the] injuries to assist the trier of fact in understanding the case." *Id.* at 514. A similar analysis here shows that Dr. Arnold's opinion that Hofherr's impairment from the THC was a contributing cause of the collision with Mr. Dahl is not completely reliable.

First, Dr. Arnold admitted in her deposition that she had not reviewed all the evidence from the scene of the collision. She only reviewed the urine and blood test results, the ISDOT records on this case, part of Hofherr's deposition, and the police report. Dr. Arnold did not review any photographs from the scene or any transcripts of other depositions in this case, including the deposition of eyewitness, Sheriff Cowan. As such, Dr. Arnold's scope of specific

knowledge related to the totality of circumstances involved before, during, and after the collision bring into question the reliability of Dr. Arnold's conclusion as to causation.

Second, Dr. Arnold's testimony fails to connect her specialized knowledge about impairment of drivers who have ingested THC to her opinion Hofherr's impairment contributed to the accident. Dr. Arnold's causation opinion arises after a thorough, logical progression of questions that led her reasonably to conclude that Hofherr was impaired by the THC in his system that day. In fact, the deposition transcript suggests that counsel did not ask her opinion about causation, but only jumped to it based on Dr. Arnold's answer. Counsel asked Dr. Arnold:

> Q        And based on the blood test and the circumstance of the accident itself, is it your understanding to a reasonable degree of scientific certainty that [Hofherr] was, in fact, impaired to a degree at the time of the occurrence due to the THC?

Doc. No. 69-1 at 230, 36:11–15. In response to this question about whether Hofherr was impaired by the THC—not whether his impairment caused the collision—Dr. Arnold replied with the following statement:

> A        I believe that that was a contributing factor.

*Id*. at 36:16. A bit of a *non sequitur*, Dr. Arnold's response must have confused counsel enough to seek clarification with the following question:

> Q        Just so I understand, you believe that the THC in [Hofherr's] blood resulted in an impairment which contributed to the accident; is that fair?

*Id.* at 36:17–19. Dr. Arnold confirmed by saying, "Yes." *Id*. at 36:20.

Notably, counsel's original question asked nothing about whether Hofherr's impairment contributed to the accident. Counsel was just trying to confirm Dr. Arnold's opinion about

whether Hofherr was impaired.   In addition, counsel asked no further questions about causation. As a result, the deposition transcript, which is the only record of Dr. Arnold's causation opinion, presents a barebones conclusion with no description of the methodology used to reach this conclusion.   With such an analytical gap, the Court is not convinced that Dr. Arnold is qualified to opine on causation or that her barebones conclusion will assist the jury in assessing causation. Therefore, Dr. Arnold's testimony as to causation only should be excluded.

## IV.   CONCLUSION

First, some of Dwayne G. Owen's opinions regarding the Hofherr/Dahl collision are unreliable because his qualifications on some topics are insufficient; some opinions are merely speculative; and some opinions simply repeat the testimony of other witnesses or present information within the experience of the jurors.   Accordingly, some of Owen's testimony, as delineated below, must be excluded.

Second, David S. Gibson's opinion as to Mr. Dahl's lost earnings is reliable.   Any legal insufficiencies can be addressed through other testimony or evidence.

Third, Dr. Sheila Arnold's testimony as to causation is unreliable because an analytical gap exists between her specialized knowledge, her knowledge of the facts of this case, and her conclusion and therefore will not assist the jury.

Therefore, the Court now **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Exclude Expert Witness Testimony.   [Doc. No. 66].

A)   **<u>Dwayne G. Owen</u>**, Mrs. Dahl's expert accident reconstructionist,

**MAY** testify regarding
  (1) Hofherr's speed and attention to the road conditions when he
  lost control of the tractor-trailer and collided with Mr. Dahl;

(2) whether Hofherr employed improper driving techniques to regain control of the tractor-trailer and whether his driving techniques contributed to his loss of control of the vehicle; and (3) the effects of THC/drugs on drivers generally; and

**MAY NOT** testify regarding

(1) the effects of THC on Defendant Hofherr on the day of the collision with Mr. Dahl;

(2) whether THC was the proximate cause of Hofherr's loss of control of the tractor-trailer;

(3) whether Mr. Dahl's actions before and during the collision were reasonable; and

(4) whether Mr. Dahl could have avoided the collision.

B)     **David S. Gibson**, Mrs. Dahl's expert vocational economist, **MAY** testify as to Mr. Dahl's lost earnings.

C)     **Dr. Sheila A. Arnold**, Mrs. Dahl's expert forensic toxicologist, **MAY NOT** testify as to whether the impairment resulting from the THC in Hofherr's system caused the collision with Mr. Dahl.

Lastly, the Court **GRANTS** Plaintiff's Motion to Set Trial Date.   [Doc. No. 72].   The Court

**SETS** a telephonic scheduling conference **Tuesday, December 6, 2016**, at **10:15 a.m.** (E.S.T.).

The Court will call all counsel listed on the docket sheet unless it is notified that specified

attorneys need not be contacted.   If, at the time of the scheduled conference, you will not be at

the telephone number identified on the docket please contact chambers.

**SO ORDERED.**

Dated this 18th day of November, 2016.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge